**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**RIMS BARBER, CAROL BURNETT, JOAN BAILEY,**
**KATHERINE ELISABETH DAY, ANTHONY LAINE**
**BOYETTE, DON FORTENBERRY, SUSAN GLISSON,**
**DERRICK JOHNSON, DOROTHY C. TRIPLETT,**
**RENICK TAYLOR, BRANDIILYNE MANGUM-DEAR,**
**SUSAN MANGUM, AND JOSHUA GENERATION**
**METROPOLITAN COMMUNITY CHURCH**                                 **PLAINTIFFS**


**v.**                                                          **Civil Action No. 3:16-cv-417-CWR-LRA**

**PHIL BRYANT, GOVERNOR OF MISSISSIPPI;**
**JIM HOOD, ATTORNEY GENERAL OF MISSISSIPPI;**
**RICHARD BERRY, EXECUTIVE DIRECTOR OF THE**
**MISSISSIPPI DEPARTMENT OF HUMAN SERVICES;**
**and JUDY MOULDER, MISSISSIPPI STATE**
**REGISTRAR OF VITAL RECORDS**                                 **DEFENDANTS**


**MEMORANDUM IN OPPOSITION TO**
**PLAINTIFFS' MOTION  FOR PRELIMINARY INJUNCTION**
**OF DEFENDANTS JIM HOOD AND JUDY MOULDER**

Jim Hood, Attorney General of Mississippi, and Judy Moulder, Mississippi State

Registrar of Vital Records, two of the Defendants herein, respectfully submit this Memorandum

in Opposition to Plaintiffs' Motion for Preliminary Injunction:

**INTRODUCTION**

Plaintiffs have brought this facial challenge to House Bill 1523 of the 2016 Regular

Session[1] of the Mississippi Legislature, alleging H.B. 1523 violates the Establishment Clause of

the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.  Because

the law goes into effect on July 1, 2016, Plaintiffs seek an immediate preliminary injunction

---

[1]Miss. Laws 2016, H.B. 1523 (eff. Jul. 1, 2016).

"prohibiting enforcement of H.B. 1523." Compl. [Doc. 1], at 14.

In *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015), the Supreme Court dramatically changed the legal and cultural landscape by holding that state bans on same-sex marriage violated a fundamental right to marry protected by the Due Process and Equal Protection Clauses of the Fourteenth Amendment.[2] Only five days later, the Fifth Circuit emphasized that *Obergefell* specifically recognized that the competing Free Exercise rights of those who object to same-sex marriage on moral grounds are protected by the First Amendment, stating that "[h]aving addressed fundamental rights under the Fourteenth Amendment, the [Supreme] Court, importantly, invoked the First Amendment, as well:

> Finally, it must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered. The same is true of those who oppose same-sex marriage for other reasons. In turn, those who believe allowing same-sex marriage is proper or indeed essential, whether as a matter of religious conviction or secular belief, may engage those who disagree with their view in an open and searching debate. The Constitution, however, does not permit the State to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex.

*CSE v. Bryant*, 791 F.3d 625, 627 (5th Cir. 2015) ("*CSE I*") (quoting *Obergefell*, 135 S. Ct. at 2607)).

*Obergefell*, in both its Fourteenth and First Amendment iterations, is the law of the land and, consequently, the law of this circuit and should not be taken lightly

---

[2] "The Court invalidates the marriage laws of more than half the States and orders the transformation of a social institution that has formed the basis of human society for millennia, for the Kalahari Bushmen and the Han Chinese, the Carthaginians and the Aztecs." *Obergefell*, 135 S. Ct. at 2612 (Roberts, C.J., dissenting).

2

by actors within the jurisdiction of this court. *We express no view on how controversies involving the intersection of these rights should be resolved but instead leave that to the robust operation of our system of laws and the good faith of those who are impacted by them.*

*CSE I*, 791 F.3d at 627 (emphasis added).

By its terms, H.B. 1523 is an accommodation law intended to convey the strongest protection for the "free exercise of religious beliefs and moral convictions" permitted by the state and federal constitutions. H.B. 1523 is about the people of conscience who need the protection of H.B. 1523,[3] and does not "target" Plaintiffs. Protection of free conscience and the Free Exercise of religion are legitimate and compelling governmental interests. H.B. 1523 is constitutional as a reasonable accommodation for the protection of people holding moral and religious beliefs --- even though Plaintiffs disagree with those beliefs and find them "offensive."

The Court is confronted here with a *potential* intersection of rights protected by the First and Fourteenth Amendment interests. However, Plaintiffs do not present an Article III case or controversy which is ripe for decision. In contrast to the "open and searching debate" contemplated by *Obergefell*, Plaintiffs here seek to stifle the expression of any belief opposing same-sex marriage. To protect people of conscience and faith who oppose same-sex marriage on

---

[3] "Today's decision, for example, creates serious questions about religious liberty. Many good and decent people oppose same-sex marriage as a tenet of faith, and their freedom to exercise religion is—unlike the right imagined by the majority—actually spelled out in the Constitution. Amdt. 1. Respect for sincere religious conviction has led voters and legislators in every State that has adopted same-sex marriage democratically to include accommodations for religious practice. The majority's decision imposing same-sex marriage cannot, of course, create any such accommodations. The majority graciously suggests that religious believers may continue to "advocate" and "teach" their views of marriage. Ante, at 2607. The First Amendment guarantees, however, the freedom to "exercise " religion. Ominously, that is not a word the majority uses. Hard questions arise when people of faith exercise religion in ways that may be seen to conflict with the new right to same-sex marriage . . . There is little doubt that these . . . questions will soon be before this Court. Unfortunately, people of faith can take no comfort in the treatment they receive from the majority today." *Obergefell*, 135 S. Ct. at 2625-26 (Roberts, C.J., dissenting).

moral or religious grounds, the Mississippi Legislature enacted H.B. 1523. This Court should reject Plaintiffs' myopic view of H.B. 1523's purposes and effects and hold that H.B. 1523 is an appropriate and necessary accommodation for those who hold moral and religious views that preclude them from participating in or assisting with same-sex marriage. These Defendants therefore respectfully request that the motion for preliminary injunction be denied.

## ARGUMENT

To justify the extraordinary relief of a preliminary injunction, Plaintiffs must show: (1) a substantial likelihood of success on the merits; (2) substantial threat of an irreparable injury without the relief; (3) threatened injury that outweighs the potential harm to the party enjoined; and (4) that granting the preliminary relief will not disserve the public interest. *Tex. Med. Providers Performing Abortion Servs. v. Lakey,* 667 F.3d 570, 574 (5th Cir. 2012). A movant must "clearly establish each of the traditional four preliminary injunction elements." *DSC Commc'n . Corp. v. DGI Tech., Inc.*, 81 F.3d 597, 600 (5th Cir. 1996).

The decision to grant a preliminary injunction is the exception rather than the rule. *Mississippi Power & Light v. United Gas Pipe Line Co.*, 760 F.2d 618, 620 (5th Cir. 1985). The Fifth Circuit has "cautioned repeatedly" that a preliminary injunction is an "extraordinary remedy" to be granted only if the party seeking it has "clearly carried the burden of persuasion" on all four elements. *PCI Transp., Inc. v. Fort Worth & Western R.R. Co.*, 418 F.3d 535, 545 (5th Cir. 2005); *see also Canal Authority v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974) (preliminary injunction is "an extraordinary *and drastic* remedy") (emphasis added); *see also Lake Charles Diesel, Inc. v. General Motors Corp.*, 328 F.3d 192, 203 (5th Cir. 2003) (The "absence of likelihood of success on the merits is sufficient to make the district court's grant of a

preliminary injunction improvident as a matter of law").

I.    **Plaintiffs Cannot Demonstrate a Substantial Likelihood of Success on the Merits for Injunctive Relief.**

    A.    **Plaintiffs Have No Likelihood of Success on the Merits Because H.B. 1523 Is Not Facially Unconstitutional.**

Plaintiffs do not, in so many words, specify whether this is a facial challenge or an "as applied" challenge.  However, the relief sought by Plaintiffs is total facial invalidation of H.B. 1523.  Plaintiffs ask the Court to: "a. [i]ssue a declaratory judgment that H.B. 1523 is unconstitutional; b. Issue a preliminary and permanent injunction prohibiting enforcement of H.B. 1523."  Compl. [Doc. 1], at 14.  Because Plaintiffs' challenge is facial, they bear a heavy burden to show that H.B. 1523 is unconstitutional in all its applications.   As the Supreme Court has instructed,

> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records. Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.  Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.  We must keep in mind that a ruling of unconstitutionality frustrates the intent of the elected representatives of the people.

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008)(internal citations and quotation marks omitted). The relevant question for a court assessing a facial challenge is whether the plaintiffs can demonstrate that the statute is "unconstitutional in all of its applications," or, in other words, whether "no set of circumstances

exists under which the Act would be valid." *Washington State Grange*, 552 U.S. at 449.[4]

Plaintiffs cannot show H.B. 1523 is facially unconstitutional and therefore cannot demonstrate a substantial likelihood of success on the merits for several reasons. For example, the statute on its face provides that "[t]he person recusing himself or herself shall take all necessary steps to ensure that the authorization and licensing of any legally valid marriage ***is not impeded or delayed as a result of any recusal*.**" H.B. 1523 § 3 (8)(a). (emphasis added). Moreover, the statute states that "[n]othing in this act shall be construed to prevent the state government from providing, either directly or through an individual entity not seeking protection under this act, any benefit or service authorized under the state law." H.B. 1523 § 8(2). Thus, if any couple eligible for marriage applies for a license, they will receive one on the same material terms and conditions as everyone else—that is their license cannot be denied, delayed or impeded.

The hallmark of an equal protection challenge—fundamentally lacking in this case—is that similarly situated persons are treated differently. *See, e.g., Rolf v. City of San Antonio*, 77 F.3d 823, 828 (5th Cir. 1996) ("The equal protection clause of the fourteenth amendment is essentially a mandate that all persons similarly situated must be treated alike."); *see also City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432 (1985) (same). H.B. 1523 mandates that Plaintiffs receive a marriage license and that they not be denied, impeded or delayed in obtaining the license. *See* Section 3, (8)(a) and Section 8(2).

---

[4] *See also Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 290 n.5 (5th Cir. 2015); *Hersh v. United States ex rel. Mukasey*, 553 F.3d 743, 762 n.23 (5th Cir. 2008); *Center for Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006); *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004). "The fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid. . . ." *United States v. Salerno*, 481 U.S. 739, 745 (1987); *see also In re IFS Fin. Corp*., 803 F.3d 195, 208 (5th Cir. 2015).

Second, religious accommodation laws are not facially unconstitutional. In fact, as did the dissenters in *Obergefell*, the Fifth Circuit foreshadowed the need for such laws when it addressed Supreme Court's decision on same-sex marriage. *CSE I*, 791 F.3d at 627. Section (8)(a) accommodates the interests of both same-sex rights under the Fourteenth Amendment (no impediment or delay as a result of any recusal) and the Free Exercise rights of persons with "sincerely held religious beliefs or moral convictions" that same-sex marriage is morally wrong. *See* H.B. 1523, § 2.

Third, H.B. 1523 "shall be construed in favor of a broad protection of free exercise of religious beliefs and moral convictions, *to the maximum extent permitted by the state and federal constitutions.*" H.B. 1523 § 8(1) (emphasis added). Thus, by its terms H.B. 1523 acknowledges the limitations placed on its enforceability.[5]

## B. Plaintiffs Have Failed to Establish Standing.

Plaintiffs have failed to establish standing to transform either their First or Fourteenth Amendment claims into an Article III case or controversy, much less shown that they are entitled to extraordinary relief in the form of a preliminary injunction.[6] Each and every "injury" asserted

---

[5] Whether an invalid or unconstitutional portion of a statute is severable is an issue of state law. *E.g.*, *Virginia v. Hicks*, 539 U.S. 113, 121 (2003). The Mississippi Code contains a general severability provision: "[i]f any chapter, article, section, paragraph, sentence, clause, phrase or any part of the Mississippi Code of 1972 is declared to be unconstitutional or void, or for any reason is declared to be invalid or of no effect, the remaining chapters, articles, sections, paragraphs, sentences, clauses and phrases shall be in no manner affected thereby but shall remain in full force and effect." Miss. Code Ann. § 1-1-31. Section 1-3-7 adds the following: "[u]nless the contrary intent shall clearly appear in the particular act in question, each and every act passed hereafter shall be read and construed as though the provisions of the first paragraph of this section form an integral part thereof, whether expressly set out therein or not." Miss. Code Ann. § 1-3-77.

[6] Based on the allegations in the complaint, Plaintiffs have asserted the following interests relevant to standing: 1. Clergy, Religious Leaders, and Religious Organizations: Rev. Barber, Rev. Burnett, Rev. Fortenberry, Rev. Mangum-Dear, and Director of Worship Mangum, Joshua Generation Metropolitan Community Church; 2. Transgender individuals: Katherine Day and Tony Boyette; 3.

by Plaintiffs is hypothetical, conjectural, or otherwise inadequate to satisfy the injury in fact requirement. Further, even if the injury requirement could be met, Plaintiffs have failed to show any purported injury that is fairly traceable to a particular named Defendant and which would be redressed by injunctive relief against any named Defendant.

A preliminary injunction is never appropriate when the moving parties lack Article III standing. *See, e.g.*, *Prestage Farms, Inc. v. Board of Sup'rs of Noxubee County, Miss.*, 205 F.3d 265, 267-68 (5th Cir. 2000), *reh'g en banc denied*, 216 F.3d 1081 (vacating preliminary injunction for lack of standing and remanding for dismissal). All three required Article III standing elements must be met before a Court may even consider awarding any injunctive relief against the defendants. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted); *see also Friends of the Earth, Inc. V. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (recognizing plaintiffs must independently establish standing for each remedy sought).

Further, standing is not a technicality or speed bump on the road to a decision on the merits. Standing doctrine goes directly to the constitutional limits placed on the jurisdiction of the federal courts:

> While Plaintiffs attempt to marginalize this argument as a mere technicality, standing is a threshold matter to the justiciability of claims in federal court under Article III of the Constitution . . . The federal courts are not empowered to seek out and strike down any governmental act that they deem to be repugnant to the Constitution. Rather, federal courts sit "solely, to decide on the rights of individuals," *Marbury v. Madison*, 1 Cranch 137, 170, 2 L.Ed. 60 (1803), and must " 'refrai[n] from passing upon the constitutionality of an act ... unless obliged to do so in the proper performance of our judicial function, when the

Married Same Sex Couple: Rev. Mangum-Dear and Susan Mangum; 4. Engaged Same-Sex Individual: Renick Taylor; 5. State Employee of the University of Mississippi and Unmarried Individual: Dr. Susan Glisson; and 6. Private Individuals: Joan Bailey, Derrick Johnson, and Dorothy Triplett.

question is raised by a party whose interests entitle him to raise it.' " *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 598, 127 S. Ct. 2553, 168 L.Ed.2d 424 (2007) (some citations and internal quotation marks omitted).

*Campaign for Southern Equality v. Mississippi Dept. of Human Servs.*, --- F. Supp. 3d ---, 2016 WL 1306202 (S.D. Miss. Mar. 31, 2016) ("*CSE II*") . Further, "[t]he court must evaluate each plaintiff's Article III standing for each claim; 'standing is not dispensed in gross.'" *Fontenot v. McCraw*, 777 F.3d 741, 746 (5th Cir.2015) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6, 116 S. Ct. 2174, 135 L.Ed.2d 606 (1996)).

### 1.     Plaintiffs Have Not Shown Standing for Their Establishment Clause Claims.

The Supreme Court has emphasized that plaintiffs seeking relief under the Establishment Clause must meet the same irreducible, minimal constitutional requirements as in other areas of the law, injury in fact, causation, and redressability. *Arizona Christian School Tuition Org. v. Winn*, 563 U.S. 125, 133-34, 143 (2011). However, there are two unique ways in which an Establishment Clause plaintiff may satisfy the injury requirement: (1) economic injury, *i.e*, taxpayer standing under *Flast v. Cohen*, 392 U.S. 83 (1968) and its progeny; and (2) non-economic injuries, such as in *Van Orden v. Perry*, 545 U.S. 677 (2005) (repeated visual confrontation over a six-year period with 6' x 3.5' "monolith" inscribed with text of Ten Commandments and displayed on grounds of Texas state capitol).

***Taxpayer Standing*:** In *Frothingham v. Mellon*, 262 U.S. 447 (1923), the Supreme Court held that generally a plaintiff's status as a taxpayer is inadequate to establish standing. In *Flast v. Cohen*, 392 U.S. 83 (1968), the Court carved out a "narrow exception" from that rule, holding that federal taxpayer standing may be enough for an Establishment Clause challenge, but only if there is a sufficient nexus between plaintiff's status as a taxpayer, the expenditure of tax funds,

and the law challenged by the plaintiff. To establish *state* taxpayer standing, a plaintiff must show: a logical link between the plaintiff's taxpayer status and the type of law attacked, and a nexus between the plaintiff's taxpayer status and the precise nature of the alleged infringement. *Winn*, 563 U.S. at 138-39. Pre-*Winn*, the Fifth Circuit had stated: "[i]n order to establish state or municipal taxpayer standing to challenge an Establishment Clause violation, a plaintiff must not only show that he pays taxes to the relevant entity, he must also show that tax revenues are expended on the disputed practice." *Doe v. Duncanville Indep. Sch. Dist.*, 70 F.3d 402, 408 (5th Cir. 1995).[7] In other words, a plaintiff has to show that such a claim is "a-good faith pocketbook action," in that the taxpayer has been economically injured because state taxes are being spent specifically to carry out the challenged law --- the mere "incidental expenditure of tax funds" is not enough. *Winn*, 563 U.S. at 138-39 (citing *Doremus v. Board of Ed. of Hawthorne*, 342 U.S. 429 (1952)).

As to taxpayer standing, the interests of the individual Plaintiffs' coincide, but the same deficiencies show that none of the Plaintiffs satisfy the taxpayer injury requirement. Plaintiffs have alleged only that: "[e]ach of the Individual Plaintiffs is a citizen, resident, and taxpayer of the State of Mississippi." Complaint [Doc. 1], at 4, ¶ 17. Plaintiffs have not identified any specific expenditure of state funds in connection with H.B. 1523, and have not alleged any facts to show the required nexus between their status as taxpayers and any portion of H.B. 1523. Nothing suggests that this lawsuit is a "good-faith pocketbook action." H.B. 1523 does not appropriate any funds, nor does it require any expenditures of state tax revenues. "[I]ncidental

---

[7] *See also Does 1-7 v. Round Rock Ind. Sch. Dist.*, 540 F. Supp. 2d 735, 742-43 (W.D. Tex. 2007) (standing requires evidence that expenditures of tax funds or public employee time must be more than *de minimus* and must be supported by a separate tax, paid by a particular appropriation, or add to the expense of conducting the public entity's business).

expenditure[s]" do not satisfy *Doremus*.[8]

**Non-Economic Injury**: In proper circumstances, non-economic injuries can be sufficient to confer standing for an Establishment Clause challenge. *See, e.g, Van Orden*, 545 U.S. at 682-83 (repeated visual confrontation over a six-year period with 6' x 3.5' Ten Commandments "monolith"). The state-sponsored religious symbol cases relied on by Plaintiffs focus on confrontation with a physical religious symbol: if evidence proves that a plaintiff is repeatedly confronted by a potentially offensive physical religious symbol, that individual may meet the injury requirement. However, the Supreme Court has sharply limited the type of non-economic injury that is sufficient, holding that "the psychological consequence presumably produced by observation of conduct with which one disagrees" is *not* enough to establish standing. *Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 485-86 (1982). Even if a plaintiff meets the injury requirement, he or she must still also satisfy the traceability and redressability requirements. *Winn*, 563 U.S. at 143 ("Further, respondents cannot satisfy the requirements of causation and redressability.").

The Tenth Circuit case relied on by Plaintiffs, *Awad v. Ziriax*, 670 F.3d 111 (10th Cir. 2012) represents the outer edge of Establishment Clause standing doctrine, and is distinguishable. In *Awad*, the Tenth Circuit held that a Muslim alleging he was injured by a proposed Oklahoma state constitutional amendment (that would have explicitly barred the use of "Sharia law" in state courts) had standing for an Establishment Clause challenge. *Awad*, 670 F.3d at 1122. The Tenth Circuit analogized "the personal and unwelcome contact" the plaintiff

_____

[8] Even if Plaintiffs could somehow establish the required nexus, standing would only be appropriate in connection with the specific portion of H.B. 1523 connected with the expenditure. Standing for a facial challenge to H.B. 1523 would still be lacking.

11

had with the constitutional amendment to the contact other plaintiffs had in the context of

government-sponsored religious symbols. *Id.* However, the plaintiff in *Awad* alleged additional

injuries showing he had presented a justiciable claim. *Id.* at 1120 (state court could not probate

plaintiff's will which referenced or incorporated Sharia law). Further, in *Awad* an express

prohibition on the use of Sharia law, an integral part of the Islamic faith, was contained in the

challenged law:

> The Courts . . . when exercising their judicial authority, shall uphold and adhere to
> the law . . . and if necessary the law of another state of the United States provided
> the law of the other state *does not include Sharia Law*, in making judicial
> decisions. The courts shall not look to the legal precepts of other nations or
> cultures. *Specifically, the courts shall not consider international law or Sharia
> Law.*

*Id.* at 1117-18 (emphasis added).

The Tenth Circuit retrenched somewhat and distinguished *Awad* in *COPE v. Kansas State

Bd. of Educ.*, --- F.3d ---, 2016 WL 1569621 (Apr. 19, 2016), holding that plaintiffs attempting to

challenge state educational standards did not have standing. Specifically, the *COPE* plaintiffs

alleged that the state had "a non-religious worldview in the guise of science education . . . driven

by a covert attempt to guide children to reject religious beliefs," thereby violating the

Establishment Clause. The Tenth Circuit distinguished *Awad* and held the *COPE* plaintiffs

lacked standing. *Id.* The court emphasized that in *Awad*, the law "targeted the Muslim religion

explicitly and interfered with the plaintiff's ability to practice his faith and access legal

processes." *Id.* at *2. Further, the *COPE* plaintiffs did not "offer any allegations to support the

conclusion that the Standards are a government-sponsored religious symbol." *Id.* (citing

*American Atheists, Inc. v. Davenport*, 637 F.3d 1095 (10th Cir. 2010) ("plaintiffs had standing to

challenge the placement of crosses along public roadsides as government-sponsored religious symbols with which they had personal and unwelcome contact")).

The allegations in the complaint concerning non-economic injury can be distilled down to:  by the enactment of H.B. 1523, Plaintiffs have been "confronted" with an endorsement of beliefs or convictions with which they disagree; they have read and are familiar with H.B. 1523, they have been "exposed to the intense controversy" concerning H.B. 1523, they have followed the media coverage; and that they are aware that the law will take effect on July 1, 2016.  Compl. [Doc. 1], at 4 ¶ 18.   Plaintiffs further allege that they "disagree with those beliefs and convictions [defined in Section 2] and are offended by the State's endorsement and special protection of them."  Compl. [Doc. 1], at 5 ¶ 19.  Last, Plaintiffs allege that the beliefs in Section 2 convey a state-sponsored message of disapproval and hostility to those who do not share those beliefs and convictions . . . and indicates that their status is disfavored in the social and political community of their own home state . . . . [while] [a]t the same time . . . sends a message to Mississippians who do share those beliefs and convictions that they are favored members of the social and political community."  Compl. [Doc. 1], at 5 ¶ 19.

Plaintiffs ask the Court to break new ground and vastly expand the state-sponsored religious symbol cases to include purely psychological discomfort.  The state-sponsored religious symbol cases focus on the presence of a physical symbol which by its very appearance identifies a particular religion or sect, *e.g.*, a cross for Christianity, a menorah or Star of David for Judaism, and so forth.  H.B. 1523 is not a state-sponsored religious symbol, so the creche/menorah cases relied on by Plaintiffs are inapposite.

In *Valley Forge*, the Supreme Court rejected the premise that "psychological

consequences" of disagreement would meet the injury requirement in an Establishment Clause challenge. In *Awad*, the Tenth Circuit stretched the Establishment Clause standing doctrine to its uttermost limit, but did not base its ruling solely on the "psychological consequences" of the mere existence of an offensive law. Plaintiffs ask this Court to stretch Supreme Court precedents beyond the breaking point, and rule that the mere existence of H.B. 1523 is sufficient to satisfy the injury requirement. The courts have been loath to extend the state-sponsored religious symbol cases to include abstract injuries caused by exposure to an unwelcome religious message:

> Plaintiffs' argument would extend the religious display and prayer cases in a significant and unprecedented manner and eviscerate well-settled standing limitations. Under plaintiffs' theory, every government action that allegedly violates the Establishment Clause could be re-characterized as a governmental message promoting religion. And therefore everyone who becomes aware of the "message" would have standing to sue. The neighbors in *Valley Forge*, the hotel workers at a conference for faith-based organizations in *Hein*, the list goes on—all could have obtained standing to sue simply by targeting not the government's action, but rather the government's alleged "message" of religious preference communicated through that action . . . The jurisdictional requirements of Article III are not so manipulable. *They do not allow anyone who becomes aware of a government action that allegedly violates the Establishment Clause to sue over it on the ground that they are offended by the allegedly unconstitutional "message" communicated by that action.*

*In re Navy Chaplaincy*, 534 F.3d 756, 764-65 (D.C. Cir. 2008) (emphasis added).

Simply being offended by the existence of a law with which they disagree does not confer standing on Plaintiffs.[9] At most, Plaintiffs have alleged the type of "psychological consequence presumably produced by observation of conduct with which one disagrees" that has been held

---

[9] Further, Plaintiffs' allegations that they are "targeted" by H.B. 1523 is belied by the text of the law. H.B. 1523 is a limitation on the authority of state government to take adverse action against persons who oppose the beliefs in Section 2 because of a sincerely held religious belief *or moral conviction*. H.B. 1523 does not target Plaintiffs' beliefs simply because it protects people who sincerely hold beliefs concerning the essence of marriage and gender identity that are not shared by Plaintiffs. H.B. 1523 targets for protection those persons most in danger of discrimination, discipline, and adverse action because of their beliefs concerning marriage in the post-*Obergefell* era.

insufficient to establish standing in *Valley Forge* and other cases.

Further, even if any of the Plaintiffs could meet the injury requirement, Plaintiffs have not alleged any facts sufficient to show causation:  an injury fairly traceable to any of the named Defendants, or that the requested relief would be likely to redress their alleged injuries:

> As the Supreme Court has often stated, mere personal offense to government action does not give rise to standing to sue.  "By the mere bringing of his suit, every plaintiff demonstrates his belief that a favorable judgment will make him happier. But although a suitor may derive great comfort and joy" from knowing that the Government is following constitutional imperatives, "that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury."

*In re Naval Chaplaincy*, 534 F.3d at 763 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) (internal citations omitted)).  Plaintiffs cannot establish standing for their Establishment Clause claims, and (as shown in the next section) cannot establish standing for their Equal Protection claims.

### 2.	Plaintiffs Do Not Have Standing for Their Equal Protection Claims.

***Plaintiffs Have Suffered No Injury As a Result of H.B.1523***: As to injury, federal courts may only adjudicate claims based on "concrete" injuries that are "actual" or "imminent," not merely "conjectural" or "hypothetical." *Lujan,* at 560 (citations omitted).  Further, when an injunction is sought against conduct that has not yet occurred, there must be proof that the defendants' alleged unlawful conduct is "likely" to occur.  *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983).

In *Clapper v. Amnesty Int'l. USA*, 133 S. Ct. 1138, 1150 (2013) the Court summarized the requisite elements of standing for future injury claims:

> To establish Article III standing, an injury must be concrete, particularized, and

actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling. Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is certainly impending. Thus, we have repeatedly reiterated that threatened injury must be certainly impending to constitute injury in fact, and that [a]llegations of possible future injury are not sufficient.

*Id.* at 1150 (internal quotation marks and citations omitted).

Indisputably, none of the Plaintiffs allege that they have been denied anything as a result of H.B. 1523, which does not go into effect until July 1, 2016.[10]  Rather, Plaintiffs argue that they have standing to bring an Equal Protection Clause challenge under the Fourteenth Amendment because H.B. 1523 "targets" and "disfavors" them as they "do not subscribe to the beliefs and convictions endorsed in Section 2 of the bill." Pl. Memo. [Doc. 14], at 14.  Plaintiffs also argue standing based on animus.  *Id.*

The Supreme Court has consistently declined to find standing where an injury may occur at some unknown point in the future. *City of Los Angeles*, 461 U.S. at 102-03 ("[a]bstract injury is not enough . . . [and] plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical").[11]

---

[10]For an equal protection challenge, standing exists only for those persons who are personally denied equal treatment by the challenged discriminatory conduct. *U.S. v. Hays*, 515 U.S. 737 (1995); *Walker v. City of Mesquite*, 169 F.3d 973, 979 (5th Cir.1999)(citing *Allen*, 468 U.S. at 755 (1984)); *see also Valley Forge Christian College*, 454 U.S. at 489 n.26 (1982)(rejecting proposition that every citizen has standing to challenge every affirmative-action program on the basis of a personal right that government does not  deny equal protection).

[11]*See also United Public Workers v. Mitchell*, 330 U.S. 75, 89-91 (1947); *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941); *Massachusetts v. Mellon*, 262 U.S. 447, 488 (1923). In *Whitmore*, 495 U.S. 149 at 155, the Court reiterated that the "injury must be concrete in both a qualitative and temporal sense. The complainant must allege an injury to himself that is 'distinct and palpable, as opposed to merely '[a]bstract,' and the alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* (citations omitted).

Moreover, Plaintiffs alleged injuries are tied to the hypothetical future actions of unknown persons not before this Court. H.B. 1523 offers protections for the beliefs and convictions of Mississippians, but only if they seek and assert those protections. It is possible that no one will seek the protection of H.B. 1523 come July 1, 2016, and to assume otherwise is simply conjecture and guesswork.[12] In *Clapper*, the Court reiterated that "[i]n the past, we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id*. at 1150. In *Massachusetts v. E.P.A.*, 549 U.S. 497, 545-46 (2007), the Court said "[we] previously . . . explained that when the existence of an element of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,' a party must present facts supporting an assertion that the actor will proceed in such a manner." *Id*. (quoting *Lujan*, 504 U.S. at 562 (citation omitted). Further, Plaintiffs have not shown how any of the requested relief against any of the named Defendants would redress their alleged injuries.

**Plaintiffs Not the Object or Target of H.B. 1523**: Sensing the weakness of their argument and the hypothetical nature of their claimed injuries, Plaintiffs attempt to bolster their standing argument by suggesting that H.B. 1523 "targets" and "disfavors" them as they "do not subscribe to the beliefs and convictions endorsed

in Section 2 of the bill."[13]

---

[12] For instance, a government employee may have a "sincerely held religious belief or moral conviction" as defined in Section 2, but for reasons personal to that individual, choose not to recuse himself.

[13] Plaintiffs allege that "H.B. 1523 conveys an impermissible, state sponsored message of disapproval and hostility to those who do not share the beliefs and convictions endorsed in Section 2, and

Plaintiffs' interpretation that they are the "targets" or "objects" of H.B. 1523 finds no support from the plain language of the bill itself. The clear "object" of H.B. 1523 is not Plaintiffs, but persons "with a sincerely held religious belief or moral conviction in Section 2 of this act" --- and the basis of Plaintiffs' claims is that they do not share the same beliefs or convictions. Further, nothing in H.B. 1523 "condemns" anyone. Plaintiffs' argument fails when the proper legal analysis is applied. In *State of W. Virginia v. United States Dep't of Health & Human Servs.*, 2015 WL 6673703, at *13 (D.D.C. October 30, 2015), the court discussed the proper analytical framework in assessing when someone is an object of government action in this context:

> In *Lujan*, the Court distinguished "objects" of a government action or inaction, from those entities whose claimed injury 'arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*." As to the former – the "objects" – the Court observed, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." By contrast, for a party that is not the object of the challenged conduct, "much more is needed ... [and] causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction." Thus, as HHS correctly observes, *Lujan*'s discussion about a party as the "object" fo a government action related to the causation and redressability elements of standing, and not injury-in-fact.

*Id*. (emphasis, original internal citations omitted). H.B. 1523 protects the beliefs and convictions of "someone else" other than the Plaintiffs. Accordingly, Plaintiffs are not the "object" of the law and they have no standing to challenge it.[14]

---

to those who are condemned as part of those beliefs, and indicates that their status is disfavored in the social and political community of their own home state." *Cf. CSE I*, 2016 WL 1306202, *14 (finding irreparable harm from "stigmatic and more practical injuries")). Pl. Memo. [Doc. 14], at 14.

[14]The Court's decision in *CSE II* does nothing to bolster the Plaintiffs' argument that they are the "target" or "object" of H.B. 1523. The statute at issue in that case provided that: "Adoption by couples of the same gender is prohibited." Miss. Code Section 93-17-3(5). There is no similar statutory language in this case. In fact, just the opposite: H.B. 1523 provides protection for same-sex couples seeking a marriage license as it mandates that "lawful marriages" not be impeded or delayed because of a recusal.

***No Stigmatic Injury*:**  Plaintiffs argue that they have suffered a stigmatic injury that would give them standing:  "[b]y its very language and its endorsement, the bill reflects an animus toward those who are disfavored."  Pl. Memo. [Doc. 14], at 15.  While courts have addressed the role of stigma in the context of standing, Plaintiffs theory misses the central holding of these cases: "stigmatic injury. . . requires identification of some concrete interest with respect to which [plaintiff is] personally subject to discriminatory treatment.  That interest must independently satisfy the causation requirement of standing doctrine."  *Allen v. Wright*, 468 U.S. 737, 795 n.22 (1984).  Plaintiffs do not identify the discriminatory denial of any governmental benefit which independently satisfies the requirements of standing.  They simply contend that the language of H.B. 1523 and the passage and signing of it into law causes them stigmatic injury.  Even if the court accepted this theory, only the same-sex couples and transgender individuals could possible assert such a claim --- the other Plaintiffs who support such couples and individuals are simply third parties attempting to assert the rights of others.

The Supreme Court addressed the constitutional insufficiency of stigmatic injury in *Allen* while considering racially discriminatory school tax exemptions.  468 U.S. at 740-41.  The Court assumed that the challenged "Government tax exemptions" were the direct "equivalent of Government discrimination" and framed the issue as whether African-American plaintiffs whose children had not been victims of "discriminatory exclusion from the schools whose tax exemptions they challenge" had standing based on race to challenge this overt act of "Government discrimination."  *Id*. at 746, 754 n. 20.  The Court held that "a claim of stigmatic injury, or denigration, suffered by all members of a racial group when the Government

_____

discriminates on the basis of race" was not a sufficient injury to confer standing. *Id*. at 754.

> [Plaintiffs lack] standing to litigate their claims based on the stigmatizing injury often caused by racial discrimination. There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing. Our cases make clear, however, that such injury accords a basis for standing only to "those persons who are personally denied equal treatment" by the challenged discriminatory conduct.

*Id*. at 755 (quoting *Heckler v. Mathews*, 465 U.S. 728, 739-740 (1984)).[22]

> Respondents' stigmatic injury through not sufficient for standing in the abstract form in which their complaint asserts it, is judicially cognizable to the extent that respondents *are personally subject to discriminatory treatment*. The point is, the stigmatic injury requires identification of some *concrete interest* with respect to which respondents are personally subject to discriminatory treatment. That interest must *independently satisfy* the causation requirement of standing doctrine.

*Id*. at 795 n. 22 (citation omitted; emphasis added).

The application of *Allen* to claims of stigmatic injury is familiar in this context.. The Fourth Circuit in *Bostic* applied *Allen* in finding a same-sex couple had standing to challenge Virginia's ban on same-sex marriages. Quoting *Allen*, the Fourth Circuit found that plaintiffs' stigmatic injury supported standing only because plaintiffs had identified "some concrete interest with respect to which [he or she] [is] personally subject to discriminatory treatment" and "[t]hat interest independently satisf[ies] the causation requirement of standing doctrine." *Bostic v.*

---

[22] *Allen*'s conclusion that stigmatic injury is not sufficient follows the well-established rule that standing is possessed by persons who are directly injured by the challenged government action and is not handed out in gross to anyone who shares the race or gender of others discriminated against. *Compare Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166-67 (1972) (plaintiff had no standing to challenge a club's racially discriminatory membership policies because he had never applied for membership); *O'Shea*, 414 U.S. at 502 (plaintiffs had no standing to challenge racial discrimination in the administration of their city's criminal justice system because they had not alleged that they had been or would likely be subject to the challenged practices) *with Mississippi Univ. For Women v. Hogan*, 458 U.S. 718, 720 (1982) (male plaintiff denied admission because of gender had standing to challenge admission policies).

*Schaefer*, 760 F.3d 352, 372 (4th Cir. 2014). The plaintiffs were denied tax and adoption benefits afforded married couples of opposite sexes. *Id.* Because the plaintiffs alleged "specific, concrete instances of discrimination rather than making abstract allegations, their stigmatic injuries are legally cognizable." *Id.*

In *CSE I*, the Court quoted *Allen's* language directly from *Bostic* in reaching its conclusion that "[s]tigmatic injury stemming from discriminatory treatment is sufficient to satisfy standing injury requirement *if* the plaintiff identifies some concrete interest with respect to which he or she is personally subject to discriminatory treatment and that interest independently satisfies the causation requirement of standing doctrine." *CSE I*, 64 F. Supp. 3d at 917 (emphasis added). The Fourth Circuit's analysis in *Bostic* illustrates the point:

> The Virginia Marriage Laws erect such a barrier, *which prevents* same-sex couples from obtaining the emotional, social, and financial benefits that opposite-sex couples realize upon marriage. Second, Schall and Townley allege that they have suffered stigmatic injuries *due to their inability to get married* in Virginia and Virginia's refusal to recognize their California marriage. Stigmatic injury stemming from discriminatory treatment is sufficient to satisfy standing's injury requirement if the plaintiff identifies "*some concrete interest with respect to which [he or she] [is] personally subject to discriminatory treatment*" and "[t]hat interest independently satisf[ies] the causation requirement of standing doctrine."

*Bostic*, 760 F.3d at 372 (emphasis added; internal citations omitted).

In contrast, Plaintiffs cannot satisfy standing in this case because the fact that a government employee in a Clerk's office might recuse does not itself provide or deny a concrete government benefit to Plaintiffs: H.B. 1523 requires issuance of a marriage license to legally eligible couples without impediment or delay. Failure to issue a license because applicants were a same-sex couple could be a sufficient injury for injunctive relief. *See Davis* 123 F. Supp. 3d at 935. However, the decision in a Clerk's office as to which individual might issue the license is

not such an injury.[23]

Plaintiffs' alleged stigmatic injury based on the message they believe is being conveyed by H.B. 1523 by itself is insufficient to establish standing. That alleged stigma, without more, is insufficient to confer standing is further supported by the well-established prohibition on the litigation of generalized grievances.[24] The Supreme Court has said that a "generalized grievance" is a harm "shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Moreover, "[p]rudential principles are judicial rules of self-restraint, founded upon the recognition that the political branches of government are generally better suited to resolving disputes involving matters of broad public significance." *Apache Bend Apartments, Ltd.*, 987 F.2d 1174, 1176 (5th Cir. 1993) (en banc) (citing *Lujan*, 504 U.S. at 560).

"The judicial power to adjudicate constitutional questions is reserved for those instances in which it is necessary for the vindication of individual rights." *Id. Allen's* holding that "a claim of stigmatic injury, or denigration, suffered by all members of a racial group when the Government discriminates on the basis of race" is not an "injury judicially cognizable" requires dismissal of this matter. 468 U.S. at 754. In sum, Plaintiffs' claim of stigmatic injury does not comport with the principles articulated *Allen*, and applied by later courts, and therefore does not give them standing to challenge H.B. 1523.

---

[23] In Kentucky, in the case styled *April Miller, et al. v. Kim Davis*, In the U.S. District Court for the Eastern Dist. of Kentucky, Northern Division; No. 15-44-DLB, when a local clerk refused to issue marriage licenses to same-sex couples, the remedy approved by the district court was for the clerk to step aside and allow her deputy clerks to issue any same-sex marriage licenses. *See* Order Denying Motion to Enforce as Moot (Feb. 9, 2016) [Doc. 161]. Plaintiffs effectively argue here that H.B. 1523, by providing the same result through a recusal mechanism, causes them to suffer a stigmatic injury.

[24] "The prudential principle barring adjudication of 'generalized grievances' is closely related to the constitutional requirement of personal 'injury in fact,' and the policies underlying both are similar." *Apache Bend Apartments*, 987 F.2d at 1176.

***No Causal Connection Between Alleged Injury and Defendants***: As to causation, even assuming *arguendo* the existence of a cognizable injury, there is no causal connection between the Plaintiffs' alleged injuries and any of the named Defendants' alleged possible conduct. *Lujan*, 504 U.S. at 560. An injury "must be traceable to the defendant and not the result of the independent action of a third party." *S. Christian Leadership Conference v. Supreme Court of State of La.*, 252 F.3d 781, 788 (5th Cir. 2001)(citing *Lujan,* 504 U.S. at 60-61). "In other words, the case or controversy limitation of Art[icle] III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results in the independent action of some third party not before the court." *Simon*, 426 U.S. at 41-42. Notably, none of the potential actors by whom Plaintiffs might allegedly be harmed in the future are named as Defendants in this action.

No causal connection exists between the Plaintiffs' claimed future injury and anything the Plaintiffs could credibly claim the named Defendants will do in the future. *See Okpalobi v. Foster*, 244 F.3d 405, 426 (5th Cir. 2001). The Plaintiffs' putative future injury is simply not "fairly ... trace[able] to the challenged action of the defendant, and not...th[e] result [of] the independent action of some third party not before the court,'" *Lujan*, 504 U.S. at 560 (quoting *Simon v. Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976)) (alterations in original), and, therefore, fails the causation prong required for Article III standing.

***Plaintiffs Have Failed to Show Their Injuries Are Likely to Be Redressed by the Requested Relief***: As for the third and final standing element, awarding the Plaintiffs' requested preliminary relief against the defendants would not redress their claimed future injury. *Lujan*, 504 U.S. at 561 ("[I]t must be 'likely,' as opposed to merely 'speculative,' that the injury will be

redressed by a favorable decision.") (quoting *Simon*, 426 U.S. at 38, 43); The Plaintiffs would still be facing their same alleged injury tomorrow if the Court preliminarily enjoins the named Defendants today.

**3. The Sole Plaintiff Asserting a Free Speech Claim Has Failed to Establish Standing.**

Only one Plaintiff, Dr. Susan Glisson, has asserted a claim based on the Free Speech Clause. Dr. Glisson has failed to show any of the three irreducible minimum requirements for standing: injury, causation, and redressability. Dr. Glisson alleges she has "standing as a state employee who is not accorded the purported speech rights provided by Section 3(7) of the bill to those who subscribe to the beliefs and convictions endorsed by H.B. 1523." Pl. Memo. [Doc. 14], at 13. First, Section (3)(7) only acknowledges that state employees who hold the beliefs described in Section 2 of H.B. 1523 are entitled to same free speech rights as other employees, including those who disagree with those beliefs, "so long as,"

> (a) If the employee's speech or expressive conduct occurs in the workplace, that speech or expressive conduct is consistent with the time, place, manner and frequency of any other expression of a religious, political, or moral belief or conviction allowed; or
>
> (b) If the employee's speech or expressive conduct occurs outside the workplace, that speech or expressive conduct is in the employee's personal capacity and outside the course of performing work duties.

H.B. 1523 § 7(3).

Second, to find that Dr. Glisson had standing for this claim, would require the Court to make numerous assumptions about events that are totally speculative and unlikely to ever come to pass. Effectively, Dr. Glisson asks the Court to assume that a situation is likely to occur where a person expressing negative beliefs about same-sex marriage (or unmarried sex) would not be

subjected to discipline, but Dr. Glisson would be subject to discipline because she is not protected by H.B. 1523. Such an injury would require a highly speculative chain of events like the following to occur at some unknown future point in time: (1) expressing religious, political, or moral beliefs or convictions is permitted by the policies and practices in Dr. Glisson's specific workplace; (2) Dr. Glisson expresses beliefs in the workplace favoring same-sex marriage; (3) one of Dr. Glisson's co-workers expresses beliefs opposing same sex marriage on moral or religious grounds; (4) both Dr. Glisson and her co-worker are reprimanded for their expressive conduct; (4) letters of reprimand are placed in the personnel files of both Dr. Glisson and her co-worker; (5) the co-worker asserts she cannot be disciplined in this fashion because of her rights under H.B. 1523, such that: (6) the co-worker's letter of reprimand is removed from her file, while (7) the letter of reprimand remains in Dr. Glisson's file.

At best, the type of injury Dr. Glisson would have to show to establish Article III standing for her free speech claim is, at the present time, wholly hypothetical, conjectural, and theoretical. Therefore, Dr. Glisson has failed to prove an injury in fact for purposes of standing. Further, if such a chain of events did occur, none of the named Defendants would have anything to do with the alleged injury, which could not likely be redressed by relief against any of them. The Governor, the Attorney General, the head of MDHS, and the State Registrar have nothing to do with discipline for employees at the University of Mississippi.[25]

### C.     Plaintiffs Have Failed to Show Likelihood of Success on the Merits of Their Establishment Clause Claims.

Under binding Supreme Court and Fifth Circuit precedent, the distinction between facial

---

[25] The vague, ambiguous, and incomplete allegations regarding standing in connection with the purported Free Speech claim make it impossible to analyze the merits.

and as applied challenges under the Establishment Clause is crucial:

> Because a distinction exists between facial and as-applied Establishment Clause challenges, we must consider where the plaintiffs' claims belong. The Supreme Court has recently explained that where the "plaintiffs' claim and the relief that would follow ... reach beyond the particular circumstances of th[o]se plaintiffs," the plaintiffs must "satisfy our standards for a facial challenge to the extent of that reach" . . . To successfully mount a facial challenge, the plaintiffs must show that there is no set of circumstances under which either the language of the pledge or the requirement that children recite the pledge in classrooms is constitutional. If the plaintiffs successfully show either provision to be unconstitutional in every application, then that provision will be struck down as invalid.

*Croft v. Perry*, 624 F.3d 157, 163-64 (5th Cir. 2010). Plaintiffs have not and cannot meet the extremely high burden of proof for facial invalidation of H.B. 1523, that there is no set of circumstances under which H.B. 1523, or any portion of it, in any of its possible applications, is constitutional.

The Supreme Court has used three primary tests in Establishment Clause challenges: (1) the *Lemon* test; (2) the coercion test; and (3) the endorsement test. *Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, (5th Cir. 2001). The Fifth Circuit has summarized the three tests as follows:

> First, the three-part inquiry of *Lemon v. Kurtzman* asks (1) whether the purpose of the practice is not secular; (2) whether the program's primary effect advances or inhibits religion; and (3) whether the program fosters an excessive government entanglement with religion. The second test, the "coercion" test, measures whether the government has directed a formal religious exercise in such a way as to oblige the participation of objectors. The final test, the "endorsement" test, prohibits the government from conveying or attempting to convey a message that religion is preferred over non-religion.

*Id.* Although the *Lemon* test has been much-criticized, a majority of the Supreme Court has never expressly rejected or overruled *Lemon*.[26, 27] H.B. 1523 is constitutional under both of those

---

[26] Justice Scalia famously likened *Lemon* to

[a] ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried . . . .

tests as a reasonable accommodation of moral convictions and religious beliefs.

### 1. H.B. 1523 Does Not Discriminate Against Particular Religions or Religious Groups; Therefore, *Larson v. Valente* and *Awad v. Ziriax* are Inapposite.

Plaintiffs assert that their Establishment Clause challenge to H.B. 1523 should be analyzed pursuant to the test that was applied by the Supreme Court in *Larson v. Valente*, 456 U.S. 228 (1982) and the Tenth Circuit in *Awad v. Ziriax*. Memo. at 14. Under that test, a law will be deemed to violate the Establishment Clause unless it is "closely fitted to the furtherance" of a "compelling interest." *Larson*, 456 U.S. at 255. However, as the Plaintiffs concede, those cases involved laws that made "explicit and deliberate distinctions between different religious organizations[.]" *Id.* at 456 U.S. at 246 n.23; Memo. at 14. Nonetheless, Plaintiffs contend that this Court should apply *Larson*'s strict scrutiny analysis (instead of the *Lemon* test) in determining whether H.B. 1523 runs afoul of the Establishment Clause because H.B. 1523 makes an "explicit and deliberate distinction between different religious *beliefs*." Memo. at 14 (emphasis in original). This argument should be rejected. *Larson* merely stands for the uncontroversial proposition that the Establishment Clause prohibits states from enacting laws which grant preferential treatment to particular religions or religious denominations over others. It does not require the application of strict scrutiny to laws like H.B. 1523 which do not

---

. . . It is there to scare us . . . when we wish it to do so, but we can command it to return to the tomb at will. When we wish to strike down a practice it forbids, we invoke it, when we wish to uphold a practice it forbids, we ignore it entirely.

Erwin Chemerinsky, *Do State Religious Freedom Restoration Acts Violate the Establishment Clause or Separation of Powers?*, 32 U.C. Davis L. Rev. 645, 647 (1999) (*quoting Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384, 398 (1993) (Scalia, J., concurring in the judgment) (citations omitted)).

[27] The coercion test has no relevance to H.B. 1523, as the law does not direct a formal religious exercise in any way, much less in a way that "oblige[s]" the participation of Plaintiffs.

discriminate against certain religions or religious denominations, but rather provide accommodations to certain types of religious beliefs irrespective of religious affiliation.

In *Larson*, the Supreme Court faced the issue of whether "a Minnesota statute, imposing certain registration and reporting requirements upon only those religious organizations that solicit more than fifty per cent of their funds from nonmembers, discriminate[d] against such organizations in violation of the Establishment Clause[.]" 456 U.S. at 230. The Court held that the statute violated the "clearest command of the Establishment Clause" – "that one religious denomination cannot be officially preferred over another." *Id.* at 244. In so holding, the Court emphasized that the statute's legislative history "demonstrate[d] that the provision was drafted with the explicit intention of including particular religious denominations and excluding others."[28] *Id.* at 254. Because the law "grant[ed] a denominational preference," the Court concluded that its "precedents demand[ed] that [it] treat the law as suspect and . . . apply strict scrutiny[.]" *Id.* at 246. Moreover, the Court determined that "application of the *Lemon* tests was not necessary" because *Lemon* is "intended to apply to laws affording a uniform benefit to *all* religions, and not to provisions . . . that discriminate *among* religions." *Id.* at 252 (emphasis in original; footnote omitted).

*Larson*'s holding is limited to cases involving laws that explicitly discriminate against certain religions or religious groups.[29] Indeed, since *Larson* was decided, the Supreme Court has

---

[28]  The Court noted that language in an early draft of the bill was deleted "for the sole purpose of exempting" a Roman Catholic Archdiocese "from the provisions of the Act." *Larson*, 456 U.S. at 254.

[29]  *See Lynch v. Donnelly*, 465 U.S. 668, 679 (1984) (noting that the Court did not "find *Lemon* useful in *Larson* . . . where there was substantial evidence of overt discrimination against a particular church"); *id.* at 688 (O'Connor, J., concurring) (explaining that *Larson* strict scrutiny is only appropriate when a "statute or practice . . . plainly embodies an intentional discrimination among religions"); Michael J. Simpson, *Accommodating Indian Religions: The Proposed 1993 Amendment to the American Indian Religious Freedom Act*, 54 Mont. L. Rev. 19, 50-51 (1993) ("Subsequent cases . . . have limited *Larson*'s strict scrutiny test to statutes which single out and discriminate against certain religious denominations and have not applied the *Larson* test to laws which merely

never relied upon *Larson*'s strict scrutiny test to invalidate a statute under the Establishment Clause. Instead, the Supreme Court has applied the *Lemon* test, or at times the Coercion or Endorsement test. Therefore, *Larson* occupies a relatively obscure position in the Court's Establishment Clause jurisprudence. *See* Jeremy Patrick-Justice, *Strict Scrutiny for Denominational Preferences: Larson in Retrospect*, 8 N.Y. City L. Rev. 53, 107 (2005) ("[T]he *Larson* doctrine probably merits the obscurity it has long received.").

Moreover, *Larson* itself makes clear that it does not apply to statutes which provide protections to certain religious beliefs, but do not discriminate among religions. The petitioners in *Larson* argued that the Minnesota law was similar to the federal statute upheld in *Gillette v. United States*, 401 U.S. 437 (1971). *See Larson*, 456 U.S. at 246 n.23. The *Gillette* Court held that a federal statute which granted draft exemptions to any person who "by reason of religious training and belief," was "conscientiously opposed to participation in war in any form" did not violate the Establishment Clause, even though it did not provide an exemption to persons who objected on religious grounds to participating in a particular war. 401 U.S. at 441. The Court rested its holding on the fact that the statute "on its face, simply [did] not discriminate on the basis of religious affiliation." *Id.* at 450. To the contrary, it "focused on individual conscientious belief, not on sectarian affiliation." *Id.* at 454. Moreover, the Court concluded that the distinction drawn by the law was supported by neutral and secular justifications. *See id.* at 454-60.

In *Larson*, the Court found *Gillette* to be "readily distinguishable" because under the federal statute, "conscientious objector status was available on an equal basis to both the Quaker and the Roman Catholic"; whereas the Minnesota law "focuse[d] precisely and solely upon

_____

accommodate religious practices.").

29

religious organizations." *Larson*, 456 U.S. at 246 n.23. H.B. 1523, like the law at issue in *Gillette*, does not discriminate on the basis of religious affiliation; its purpose is to accommodate certain conscientious beliefs, not any particular religion or religious group. Any person who holds the beliefs described by H.B. 1523 may invoke the statute's protections, regardless of the religion they practice or the religious denomination to which they belong.[30] Plaintiffs' reliance on *Larson* is therefore misplaced.

**2.      H.B. 1523 is a Constitutional Accommodation of Religion and Freedom of Conscience**.

When a law like H.B. 1523 amounts to a permissive accommodation of freedom of conscience and religion which "fits within the corridor between the Religion Clauses, application of the *Lemon* test may not even be necessary. *See Cutter v. Wilkinson*, 544 U.S. 709, 716 & n.6, 720 (2005) (bypassing *Lemon* and deciding case on other grounds). Whether all of the prongs of Lemon are applicable or not, "the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause." *Corp. of Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 334 (1987).

Religious accommodation laws are not facially unconstitutional.[31] *See, e.g., Hankins v. Lyght*, 441 F.3d 96, 105-06 (2d Cir. 2006) (Federal RFRA unconstitutional as applied to state

---

[30] To the extent H.B. 1523 affects religious organizations, the focus is still on the individual conscientious beliefs described in Section 2, not sectarian affiliation. Because it protects freedom of conscience, H.B. 1523 is like the conscientious objector statute in *Gillette* rather than the statute providing financial support of favored religious organizations in *Larson*. Further, only Sections 3(1) and 3(2) of H.B. 1523 apply to religious organizations. Last, all of the alleged burdens hypothesized by Plaintiffs in this regard are illusory.

[31] Plaintiffs argue that Mississippi's Religious Freedom Restoration Act ("RFRA") sufficiently protects the interests protected in H.B. 1523. Plaintiffs' challenge to the constitutionality of H.B. 1523 must be considered on its own merits rather than whether the state RFRA protects free exercise, such that no further accommodation of free exercise by H.B. 1523 is necessary, as *Obergefell* dramatically tilted the playing field against conscientious objectors to same-sex marriage *after* the state RFRA was enacted.

law, but constitutional as applied to federal law). H.B. 1523 accommodates the beliefs of those

in favor of same-sex marriages under the Fourteenth Amendment (no impediment or delay as a

result of any recusal) and for those persons with "sincerely held religious beliefs or moral

convictions" against same-sex marriage recognized under the First Amendment. *See* H.B. 1523,

§ 2. Thus, under *Obergefell* and *Campaign for Southern Equality*, H.B. 1523 provides a

constitutionally permissible accommodation for both the same-sex marriage rights of couples

protected by the Fourteenth Amendment and the Free Exercise rights of objectors protected by

the First Amendment.

Similar statutory accommodations are well-established regarding religious beliefs and the

performance of certain public functions. For example, the federal freedom of conscience laws

known as "The Church Amendments," which were enacted shortly after *Roe v. Wade*, protect

public health care workers who disagree with abortion on moral or religious grounds and

therefore do not want to participate in performing abortions. The Church Amendments do not

permit the government "to require --- (1) such individual to perform or assist in the performance

of any sterilization procedure or abortion if his performance or assistance in the performance of

such procedure or abortion would be contrary to his religious beliefs or moral convictions."

42 U.S.C. § 300a-7(a).

The similar moral issues raised by the *Roe v. Wade* and *Obergefell* decisions, which each

abandoned long held traditional moral views related to abortion and same-sex marriage, make the

freedom of conscience laws in the abortion context particularly analogous to H.B. 1523.

In *Harris v. McRae*, 448 U.S. 297, 319 (1980), the plaintiffs challenged the Hyde

Amendment, which significantly limited federal funding for abortions, under the Establishment

Clause: "[i]t is the appellees' view that the Hyde Amendment violates the Establishment Clause because it incorporates into law the doctrines of the Roman Catholic Church concerning the sinfulness of abortion and the time at which life commences." The Supreme Court rejected the premise that because the opposition of abortion on moral grounds mirrors the beliefs of the Roman Catholic Church, the Hyde Amendment violated the Establishment Clause:

> Although neither a State nor the Federal Government can constitutionally pass laws which aid one religion, aid all religions, or prefer one religion over another . . . it does not follow that a statute violates the Establishment Clause because it happens to coincide or harmonize with the tenets of some or all religions. *That the Judeo-Christian religions oppose stealing does not mean that a State or the Federal Government may not, consistent with the Establishment Clause, enact laws prohibiting larceny.* The Hyde Amendment is as much a reflection of "traditionalist" values towards abortion, as it is an embodiment of the views of any particular religion. In sum, we are convinced that the fact that the funding restrictions in the Hyde Amendment may coincide with the religious tenets of the Roman Catholic Church does not, without more, contravene the Establishment Clause.
> (internal quotation marks and citations omitted).

*Harris*, 448 U.S. at 319-20 (emphasis added). Similarly, a state would not violate the Establishment Clause by criminalizing murder, despite sectarian religious beliefs in accord with the intent of the criminal statute.

> A statute that ostensibly promotes a secular interest often has an incidental or evan a primary effect of helping or hindering a sectarian belief. Chaos would ensue is every such statute were invalid under the Establishment Clause. For example, the State could not criminalize murder for fear that it would thereby promote the Biblical command against killing.

*Wallace v. Jaffree*, 472 U.S. 38, 69-70 (1985) (O'Connor, J., concurring).

In *National Family Planning and Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 830 (D.C. Cir. 2006), the court stated that "Congress, since 1996 has forbidden 'discrimination' against an individual who 'refuses . . . to perform . . . abortions, or to provide

referrals for . . . abortions.'" *Id.* (citing Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, § 515, 110 Stat. 1321, 1321-224 (codified at 42 U.S.C. § 238n(a)(1), (c)(2)). The court found that ". . . the 1996 provision hasn't given rise to the parade of horribles that plaintiff hypothesizes—not even a single horrible." *Id.* Thus, similar accommodations are certainly not new.

H.B. 1523 does not favor any particular religion, and the beliefs stated in the Act are not necessarily religious in nature: a non-religious person might well believe all of those things, such that the beliefs can be either secular or religious. H.B. 1523 protects freedom of conscience, regardless of whether beliefs are secular- or religious-based. Thus, H.B. 1523 has a secular purpose. Acknowledging religion, or protecting the free exercise thereof, does not automatically invalidate a law based on the Establishment Clause. *Cutter*, 544 U.S. at 720; *Amos*, 483 U.S. at 334.

The primary effect of H.B. 1523 is not to advance religion. The primary effect of H.B. 1523 is to protect freedom of conscience and prohibit discrimination by the State government against those who hold moral or religious beliefs protected by the First Amendment that are at odds with the Fourteenth Amendment marriage rights formally acknowledged in *Obergefell*. Furthermore, H.B. 1523 does not excessively entangle the State in a religious controversy or improperly promote religion over non-religion in a way that might fail the endorsement test. The controversy over the morality of same-sex marriage transcends the religious/secular distinction. H.B. 1523 seeks to protect those whose beliefs concerning same-sex marriage may, post-*Obergefell*, reasonably be expected to be marginalized by same-sex marriage supporters.[32] The

---

[32] "Today's decision usurps the constitutional right of the people to decide whether to keep or alter the traditional understanding of marriage. The decision will also have other important

33

beliefs in favor of same-sex marriage espoused by Plaintiffs do not need similar protection. Nothing bars Plaintiffs' right to express their beliefs that same-sex marriage is morally right. The answer to speech with which one disagrees "is more speech, not enforced silence." *Whitney v. California*, 274 U.S. 357, 649 (1927) (Brandeis, J., concurring).

For example, currently clerks, ministers, cake-makers, and church organists who moonlight playing music at weddings, who sincerely believe that same-sex marriage is right can simply go about their business, and their religious beliefs or moral convictions are not impacted one iota. There is not one word in H.B. 1523 that changes that.[33]

On the other hand, if a clerk, a minister, a cake-maker, or a church organist sincerely believes that same-sex marriage is wrong, for either moral or religious reasons, *that person does need protection* to avoid being compelled to assist with or participate in activities related to marriages which violate their beliefs. Apparently, in Plaintiffs' view, accommodation of the

---

consequences. *It will be used to vilify Americans who are unwilling to assent to the new orthodoxy.* In the course of its opinion, the majority compares traditional marriage laws to laws that denied equal treatment for African–Americans and women. *The implications of this analogy will be exploited by those who are determined to stamp out every vestige of dissent.* Perhaps recognizing how its reasoning may be used, the majority attempts, toward the end of its opinion, to reassure those who oppose same-sex marriage that their rights of conscience will be protected. We will soon see whether this proves to be true. *I assume that those who cling to old beliefs will be able to whisper their thoughts in the recesses of their homes, but if they repeat those views in public, they will risk being labeled as bigots and treated as such by governments, employers, and schools.*" *Obergefell*, 135 S. Ct. at 2642-43 (Alito, J., dissenting) (internal cross-references omitted) (emphasis added).

[33] In a related sense, this is why Plaintiffs' Establishment Clause claims fail even when masquerading as an Equal Protection claim. *See* Compl. [Doc. 1], at 13 ¶ 38. The touchstone of equal protection is that similarly situated persons must be treated alike, without arbitrary or irrational distinctions. Plaintiffs are not similarly situated to those holding beliefs protected by H.B. 1523, as the beliefs of same-sex couples and advocates were, in *Obergefell*, officially sanctioned by the Supreme Court. H.B. 1523 rationally protects those who need protection, rather than those who have no such need.

beliefs of those who disagree with Plaintiffs' beliefs about marriage is either unnecessary or inappropriate.

Based on Plaintiffs' arguments, the clerk, the minister, the cake-maker, or church organist who disagrees with same-sex marriage on moral grounds has to make an all-or-nothing decision: either perform those services in connection with all marriages, despite the violation of their own sincerely held moral or religious beliefs, or do not perform those services in connection with any wedding. In effect, Plaintiffs say they will be stigmatized by the fact that people holding moral or religious beliefs with which Plaintiffs disagree, should not only be permitted to hold such beliefs, but live by them. The Free Exercise Clause of the First Amendment protects the rights of conscientious objectors to the morality of same-sex marriage to do just that. Similarly, H.B. 1523 is a constitutional accommodation of religious freedom and freedom of conscience.

**D.    Plaintiffs Have Failed to Show Likelihood of Success on the Merits of Their Equal Protection Claims.**

**1.    No Evidence That H.B. 1523 Is The Result of "Animus."**

Plaintiffs allege that H.B. 1523 violates the Equal Protection Clause of the Fourteenth Amendment because it "reflects an animus toward those who are disfavored," citing *Romer v. Evans*, 517 U.S. 620, (1997). Pl. Memo. [Doc. 14], at 1. On a few occasions, the Supreme Court has invalidated laws subject to traditional equal protection rational basis review when the legislation is "inexplicable by anything but animus toward a class it affects." *Romer*, 571 U.S. at 632. The Court's animus doctrine has variously been applied to laws solely "born of animosity toward the class of persons affected," *id*. at 634, based entirely on an "irrational prejudice" *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 450 (1985), or enacted out of a "bare

congressional desire to harm a politically unpopular group." *Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). The test is not whether anyone might subjectively believe the law was driven by some "animus," "irrational prejudice," or "desire to harm" anyone. Rather, the doctrine attempts to distill the actual motivation behind a challenged law, and justifies invalidating the law if hostility toward a particular group was the only motivation for it.

The Supreme Court has identified two ways a law signals that its exclusive motivation is impermissible animus. One, where the law imposes a broad and novel deprivation of rights upon a disfavored group, such as in *Romer,* and two, where the law falls outside of the historical authority of the lawmaking sovereign to eliminate privileges a group might be entitled to otherwise, such as in *Windsor.*

Despite Plaintiffs' pleas that the Court treat this as an "apples to apples" comparison, H.B. 1523 is nothing like the Colorado constitutional amendment in *Romer*. The Colorado law at issue there eliminated a wide rage of previously existing legal rights by imposing a "sweeping and comprehensive . . . change in legal status," *Romer*, 571 U.S. at 627, and a "broad and undifferentiated disability on a single named group," *id*. at 632, and identifying and denying persons established protections "across the board," *id*. at 633, and did so in a manner "unprecedented in our jurisprudence" since it was "not within our constitutional tradition to enact laws of this sort." *Id*.[34]

By contrast, H.B. 1523 does not deny the Plaintiffs any right or privilege under the law, but seeks to protect the freedom of religious expression and conscience of persons who share the sincerely held religious beliefs or moral convictions identified in the bill. As set forth *supra* in

---

[34]The law in *Romer* expressly forbade any unit of state government, (i.e.,State, County or Municipal) from giving gay and lesbian citizens any anti-discrimination protection whatsoever.

the discussion regarding standing, Plaintiffs are not the "object" or "target" of H.B. 1523 and their subjective belief that they are is insufficient to show that the bill was "born of animosity." Further, there is also nothing unusual about a law seeking to protect religious freedoms and expression. *See supra* pp. 31-33. Thus, similar accommodations for religious beliefs and convictions are not new.

In short, this is an "apples to oranges" comparison and the Plaintiffs cannot show that H.B. 1523 was enacted due to "animus" in violation of the Equal Protection Clause of the Fourteenth Amendment.

### 2. Rational Basis for Enactment of H.B. 1523.

H.B. 1523 does not implicate a suspect class or interfere with a fundamental right, and therefore, is only subject to review under the familiar rational basis test which simply asks whether a law bears a rational relation to some legitimate governmental end. *Heller v. Doe*, 509 U.S. 312, 319-20 (1993). Rational basis review is the most deferential constitutional standard, requiring the Court only to identify a plausible reason for a law rather than second guessing enactments by litigating the facts undergirding their passage. *Id*. at 320. The inquiry must remain guided by deference to legislative decision-making, and the Court must accord the law a strong presumption of validity. *Id*. at 319-20. Furthermore, a State has no obligation to produce evidence to sustain the rationality of a statutory classification. *Id* at 319-320. ("[A] legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.").

H.B. 1523 is intended to right of citizens to hold the religious beliefs and moral convictions identified in Section 2 of the law. States have a legitimate governmental interest in

protecting religious beliefs and expression and preventing citizens from being forced to act against those beliefs by their government. *Cf. Wisconsin v. Yoder*, 406 U.S. 205, 234 n.22 (1972) ("Such an accommodation reflects nothing more than the governmental obligation of neutrality in the face of religious differences, and does not represent that involvement of religious with secular institutions which it is the object of the Establishment Clause to forestall.") (internal quotations omitted).

Some of the examples of the protections afforded by H.B. 1523 are as follows:

A.     H.B. 1523 allows clerks, who believe that marriage should be between a man and woman, to recuse themselves from having to issue a marriage license to a same-sex couple while also mandating that there be no impediment or delay in the clerk's office issuing the license. By doing so, H.B. 1523 accommodates and protects the religious beliefs or moral convictions of the citizen, while also complying with the Court's mandate in Obergefell.[35]

B.     H.B. 1523 protects citizens who decline to provide wedding-related services based on a religious belief or moral conviction. This could include a professional wedding planner who objects to same-sex marriage based on one of the beliefs or convictions outlined in Section 2 of the law. Without the protection afforded by H.B. 1523, wedding planners would be forced to plan weddings for any and all couples that request their services, same-sex, opposite sex or transgender, or abandon their profession and stop planning weddings altogether.

---

[35]H.B. 1523 also allows persons authorized to conduct weddings to recuse, but again, requires that the marriage not be impeded or delayed as a result of any recusal.

C.    H.B. 1523 protects counselors who decline to provide counseling services based on a religious belief or moral conviction listed in Section 2 of the law. Without it, counselors could be forced to counsel someone, regardless of whether that person or that person's behaviors or beliefs conflicted with the counselor's beliefs or convictions. The only alternative would be for the counselor to abandon their profession and stop counseling completely.

D.    H.B. 1523 protects religious organizations from being forced to allow or take part in activities which conflict with the organizations beliefs or convictions. Without it, a church could be forced to allow a same-sex or transgender couple to marry in their sanctuary despite the church's objections.

In summary, H.B. 1523 could not be more different than the law in *Romer* - a law that overnight stripped away *all* civil rights protections from gays and lesbians in Colorado. H.B. 1523 is simply a religious accommodation bill and does not "disfavor" anyone despite Plaintiffs' subjective belief to the contrary. H.B. 1523 clearly meets the rational basis standard as it bears "a rational relation to some legitimate end" and must be upheld as constitutional. *Heller v. Doe*, 509 U.S. 312, 319-20 (1993).[36]

**3.    Plaintiffs Not Similarly Situated to Persons Protected Under H.B. 1523.**

As a prerequisite to bringing an equal protection claim, Plaintiffs must prove that

---

[36] By contrast, in *Romer* the Supreme Court rejected the State of Colorado's rational basis argument based on freedom of association and the need for protecting landlords and employers, given that the law imposed "a broad and undifferentiated disability on a single named group" and "its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects." *Romer*, 517 U.S. at 632.

similarly situated individuals were treated differently. See *Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir.1999). In short, Plaintiffs must prove that (1) they are similarly situated to the persons protected by H.B. 1523, and (2) they will be treated differently than the persons protected by H.B. 1523. *See Beeler v. Rounsavall*, 328 F.3d 813, 816-817 (5th Cir. 2003). Plaintiffs have failed to meet this burden. Plaintiffs refer to certain specific portions of H.B. 1523, but do not explain how particular plaintiffs are similarly situated to those protected by H.B. 1523 such that any "classification" drawn thereby would be arbitrary or irrational. *See* Compl. [Doc. 1], at 9-11. Further, Plaintiffs do not demonstrate the prospect of imminent injury in any of the scenarios in which those provisions would apply.

4.     **H.B. 1523 Does Not Prohibit Laws Providing Discrimination Protection**.

Plaintiffs argue that H.B. 1523 is unconstitutional because it will repeal existing laws and ordinances that prohibit discrimination, just like the law in *Romer*. Plaintiffs cite as an example, a newly passed ordinance in the City of Jackson, Mississippi, that prohibits various forms of discrimination, including, but not limited to, discrimination based on a person's sexual orientation and gender identity. See Jackson, Mississippi Code of Ordinances §86-227, Civil Rights Declared.

Plaintiffs cannot demonstrate that H.B. 1523 will result in the repeal of anti-discrimination laws/ordinances, leading to a denial of equal protection under the law. First, the constitutional amendment in *Romer* expressly prohibited any law meant to protect gay or lesbian citizens from discrimination in Colorado. No such prohibition targeting a specific group exists in H.B. 1523. Second, a review of Jackson's anti-discrimination ordinance shows that it is actually strikingly similar to H.B. 1523 in its recognition that religious beliefs and organizations must be

protected as Section 86-228 exempts religious corporations, associations, or societies from the anti-discrimination ordinance. Further, H.B. 1523 would invalidate local ordinances only to the extent those ordinances do not provide the same level of protection for religious freedom and free exercise as provided by H.B. 1523.

## II. PLAINTIFFS CANNOT SHOW A SUBSTANTIAL THREAT OF IRREPARABLE INJURY.

Plaintiffs have not alleged, much less proved, that any of them has suffered a cognizable injury in fact sufficient to establish standing. Since Plaintiffs have not even shown the existence of any actionable injury, Plaintiffs have also failed to meet their burden to show a substantial threat of *irreparable* injury.

## III. THE BALANCE OF HARMS FAVORS DEFENDANTS.

Plaintiffs' request for a preliminary injunction in this case must be considered in a substantially different light from the preliminary injunctions sought and obtained in *CSE I* (same-sex marriage) and *CSE II* (same-sex adoption). In each of those cases, the Plaintiffs were directly and explicitly barred from enjoying rights and privileges that opposite-sex couples enjoyed. Here, Plaintiffs do not stand to suffer any irreparable injury at all.

Nothing in H.B. 1523 bars Plaintiffs from exercising their rights. Same-sex couples may enjoy the rights and benefits of marriage, including the adoption of children, just as eligible opposite-sex couples --- both before and after July 1, 2016. Nothing in H.B. 1523 changes that in any way, or purports to. H.B. 1523 specifically protects the right to marry, requiring that a clerk recusing himself or herself from issuing a marriage license: "shall take all necessary steps to ensure that the authorization and licensing of any legally valid marriage is not impeded or

delayed as a result of any recusal." H.B. 1523 § 3(8)(a). H.B. 1523 places a parallel obligation on the Administrative Office of Courts in the event of a judge's recusal from performing a same-sex marriage: [t]he Administrative Office of Courts shall take all necessary steps to ensure that the performance or solemnization of any legally valid marriage is not impeded or delayed as a result of any recusal." H.B. 1523 § 3(8)(b). Thus, the marriage rights of same-sex couples will remain fully protected, even after July 1.

Further, the Court must balance the potential harm to Plaintiffs based on the alleged Establishment Clause violation with the potential harm to those public officials and others who are conscientious objectors concerning the morality of same-sex marriage (whose Free Exercise rights will continue to be subject to potential harm) if H.B. 1523 is enjoined. Because any potential irreparable harm to Plaintiffs is *de minimus*, and because there are competing fundamental rights protected by the Free Exercise Clause, the balance of harms here favors Defendants, or is neutral.

## IV. GRANTING THE INJUNCTION WOULD NOT SERVE THE PUBLIC INTEREST.

Plaintiffs rely on the tried and true principle that "it is always in the public interest to prevent the violation of a party's constitutional rights." Pl. Memo. [Doc.14], at 21. However, the public interest would not be served unless any potential violation of, or chilling effect on, the Free Exercise rights of conscientious objectors is avoided. At this juncture, in the absence of any actual, imminent, or direct harm to Plaintiffs, the public interest factor favors permitting H.B. 1523 to go into effect on July 1, 2016. If any of the conjectural injuries or scenarios suggested by Plaintiffs' Complaint were actually to come to pass, an injured person could seek relief for an

actual injury at that time, rather than a hypothetical injury based on supposition such as those described in the Complaint.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for preliminary injunction should be denied.

**Respectfully submitted,**

**JIM HOOD, MISSISSIPPI ATTORNEY GENERAL,**

**JUDY MOULDER, MISSISSIPPI STATE REGISTRAR,**

***Defendants***

BY:    _s/Paul Barnes_____
PAUL BARNES, MSB # 99107
SPECIAL ASSISTANT ATTORNEY GENERAL


STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
Post Office Box 220
Jackson, MS   39205
Telephone No. (601)359-4072
Facsimile: 601-359-2003
pbarn@ago.state.ms.us

## CERTIFICATE OF SERVICE

      This is to certify that on this day I, Paul E. Barnes, Special Assistant Attorney General for the State of Mississippi, electronically filed the foregoing document with the Clerk of the Court using the ECF system which sent notice of such filing to the following:

      Robert B. McDuff
      Sibyl C. Byrd
      Jacob W. Howard
      MCDUFF & BYRD
      767 North Congress Street
      Jackson, MS 39202
      rbm@mcdufflaw.com
      scb@mcdufflaw.com
      jake@mcdufflaw.com

      Beth L. Orlansky
      John Jopling
      Charles O. Lee
      MISSISSIPPI CENTER FOR JUSTICE
      P.O. Box 1023
      Jackson, MS 39205-1023
      borlansky@mscenterforjustice.org

      **THIS** the 17th day of June, 2016.


                    *s/Paul E. Barnes*
                    Paul Barnes

G:\DOCS\Barber v. Bryant\draft.Barber.memo.PI motion.061716.wpd